202 P.3d 355 (2009)
Ann R. DEUTSCHER, Appellant,
v.
Jeffrey P. GABEL, D.O., and Jane Doe Gabel; and Providence Health System-Washington, Inc. d/b/a Providence Centralia Hospital, Respondents.
No. 58641-6-I.
Court of Appeals of Washington, Division 1.
March 2, 2009.
Michael King, Carney Badley Spellman, P.S., Seattle, WA, for Appellant.
Steven Fitzer, Melanie Stella, Burgess Fitzer, P.S., Tacoma, WA, for Respondents Jeffrey P. Gabel, D.O., and Jane Doe Gabel.
Rebecca Ringer, Mary Spillane, Seattle, WA, for Respondent Providence Health Systems-WA, Inc.
BECKER, J.
¶ 1 We are asked to decide whether a trial court erred by imposing sanctions on counsel for the plaintiff after a hard-fought medical malpractice trial. At the beginning of trial, counsel for the plaintiff identified a new witness, a nurse formerly employed by the defendant doctor. Counsel represented that she had discovered the nurse only by chance at the last minute, and she argued that the doctor had committed egregious misconduct by failing to identify the nurse in discovery. The court recessed the trial several times to accommodate the need to interview the new witness. Then it unfolded that the doctor's *356 receptionist had told counsel for plaintiff about the nurse months earlier during a deposition. The court imposed sanctions on plaintiff's counsel for her lack of candor to the court. Counsel contends it was wrong to sanction her because it was the doctor's responsibility to identify his employees. But another party's omissions do not justify counsel in stating that a witness is newly discovered when counsel knows that it is not true. Finding no abuse of discretion, we affirm.
¶ 2 Summer Goble was 22 years old when Dr. Jeffrey Gabel performed a hysterectomy on her. The surgery took place at Providence Centralia Hospital on June 26, 2003. In April 2004, attorney Ann Deutscher filed a medical malpractice lawsuit on behalf of Summer against Dr. Gabel and Providence. Summer alleged that Dr. Gabel pressured her into having the hysterectomy when less drastic alternatives were available. Dr. Gabel denied any wrongdoing. He claimed that Summer was adamant that she wanted a hysterectomy to end the pain and irregular bleeding associated with her menstrual cycles.
¶ 3 The matter proceeded to a jury trial in May 2005. After approximately two weeks of testimony, the jury returned a verdict of more than $1.7 million for Summer. The jury apportioned 90 percent of the fault to Dr. Gabel and 10 percent of the fault to Providence. Two weeks after the verdict, both defendants moved for a new trial. They also asked the court to sanction Deutscher for misconduct. The court granted the motion for a new trial as to Providence only. The court also granted the motion to impose sanctions. The ruling granting Providence a new trial and the remaining judgment against Dr. Gabel are not challenged on appeal. This appeal is concerned only with Deutscher's challenge to the order granting the motion for sanctions.
¶ 4 Among several instances of alleged misconduct discussed in the motion, the defendants claimed that Deutscher made false statements to the court when, at the beginning of trial, she added nurse Sandra Dickenson to the witness list and claimed she had only recently become aware of her. It came out during the trial that Dickenson's name and potential relevance to Summer's case had been made known to Deutscher months earlier during the deposition of Maria White, the receptionist at Dr. Gabel's clinic. The trial court agreed that Deutscher had not been candid, and granted the motion for sanctions based solely on the Dickenson matter. Sanctions were made payable in the amount of $6,523.45 to Dr. Gabel and $4,739.95 to Providence for defense fees and costs expended during trial to deal with adding Dickenson as a witness. Deutscher appeals. Providence responds.
¶ 5 In reviewing a sanctions decision, we apply the abuse of discretion standard. Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 338, 858 P.2d 1054 (1993). The abuse of discretion standard recognizes that deference is owed to the judicial actor who is better positioned to decide the issue, in this case, the trial judge. The trial judge has wide latitude to determine what sanctions are proper in a given case.
¶ 6 This controversy is rooted in events that took place during discovery. In June 2004, Summer sent an interrogatory asking Dr. Gabel to identify fact witnesses: "State the names, current addresses and telephone numbers of all persons having relevant knowledge of facts concerning the issues in the above-entitled case, and the general substance of their knowledge of such facts concerning the issues of liability, fault and the damages or personal injuries alleged by Summer Goble."[1] Dr. Gabel responded in October 2004, stating: "At this point, the defense is aware only of the following: 1. The parties; 2. The names contained in the medical records which have been produced and are being gathered; and 3. The names of individuals identified in discovery to date."[2] Dr. Gabel did not disclose that a temporary nurse, Sandra Dickenson, had been working with him at the time he treated Summer. And Dickenson's name was not included in *357 the medical records or other discovery materials provided to Summer up to that point.
¶ 7 Deutscher deposed Dr. Gabel on November 3, 2004. She asked Dr. Gabel about staff changes in his office during the previous two years: "In terms of employees that you have had working for you in the last two years, are they all still currently working with you?" Dr. Gabel answered: "All except for Rachel Jaeger."[3] Dr. Gabel did not disclose that Sandra Dickenson had been his nurse from April to July 2003, the timeframe during which he was treating Summer.
¶ 8 Deutscher deposed Dr. Gabel's receptionist, Maria White, in September 2005. Deutscher went over Summer's medical file with White to see if she knew whose handwriting was on the chart. White recalled that Dr. Gabel had an interim nurse named Sandra Dickenson. White thought Dickenson might have made the chart notations. Deutscher inquired about Dickenson:
[Deutscher]: Who is Sandra Dickenson?
[White]: She was the temporary nurse, I believe, right before Rachel, when Patty put in her two weeks. It might be  that might be hers.
. . .
[Deutscher]: Where is Sandra now?
[White]: I don't know. Last time I heard, she was working for Dr. Case.
[Deutscher]: Who is Dr. Case?
[White]: He is an allergist that comes down to Centralia and also has an office in Olympia.
[Deutscher]: Did Sandra leave under good terms?
[White]: I don't know. I have no clue what  I would say.
. . .
[Deutscher]: So who do you believe was Dr. Gabel's nurse in May or June of 2003?
[White]: It could be Patty. It could be Sandra. It could be Rachel. I can't remember. I was new there.
[Deutscher]: Okay. Yeah, I can understand that. But it sounds like it's most likely Rachel or Sandra?
[White]: It might be.[[4]]
¶ 9 White's disclosure that Dickenson had worked for Dr. Gabel in 2003 but was not currently working for him contradicted the answer Dr. Gabel gave at his own deposition when he said no one had left his employment except Rachel Jaeger. The contradiction should have prompted Dr. Gabel and his attorney to check payroll records. He should have then supplemented his previous answers by identifying Dickenson as an ex-employee and fact witness who had been his nurse when he treated Summer. White's disclosure should also have prompted Deutscher, if she was truly interested in finding Dr. Gabel's ex-employees or in interviewing the nurses who made the notations on Summer's medical records, to follow up to find out when Dickenson was employed, what she knew, and why she left. But it seems that White's testimony about Sandra Dickenson was ignored by both parties. Dickenson's name did not resurface until after the trial began on Monday, May 1, 2006.
¶ 10 On May 3, Deutscher disclosed Sandra Dickenson as a newly discovered witness. On May 4, she sought permission to mention Dickenson during her opening statement. Deutscher related that Dr. Gabel had inaccurately told her, during his 2004 deposition, that only one individual  Rachel Jaeger  had left his employ. She told the court she had just coincidentally met Dickenson through a potential client. And she had learned that Dickenson "was, in fact, terminated or left his employment during 2003. If I had been told that there had been a nurse who had left her employment in 2003, I would have been out looking for her aggressively."[5]
¶ 11 Deutscher said Dickenson could not remember the exact dates she had worked for Dr. Gabel, but she could testify about the policies and procedures in his office:

*358 She is going to say that Dr. Gabel refused to allow her to chart patients' signs and symptoms, and I believe she may say that he altered records .... and that it was his policy when his surgical schedule opened up to go and have her look through charts for patients who might need a hysterectomy....[[6]]
The court instructed Deutscher not to mention Dickenson during her opening statement, and to bring in more information about what Dickenson's testimony would be and the time frame it covered. Arrangements were made for Dickenson to be deposed on Wednesday, May 10. On May 11, Steven Fitzer, counsel for Dr. Gabel, reported that during the deposition, Dickenson said she worked for Dr. Gabel in August or September 2003. Fitzer moved to exclude Dickenson on the basis that she was not employed in June at the time of Summer's surgery. The court reserved ruling pending a review of the transcript. It was agreed that if Dickenson testified, it would be on May 17.
¶ 12 Over the weekend, in preparation for the possible cross-examination of Dickenson, Fitzer instructed Dr. Gabel to check to see if he had any employment records that would help determine the exact dates of Dickenson's employment. Dr. Gabel located payroll records showing that Dickenson worked for him in June 2003 when Summer had been a patient. Fitzer forwarded this information to the court and other parties. On Monday morning, May 15, he withdrew his motion to exclude Dickenson's testimony.
¶ 13 During the discussion on May 15, Deutscher pressed the court to give her another recess to go over the medical records with Dickenson. She said she now believed that Dickenson was actually the nurse who evaluated Summer and made notations in her medical charts. Deutscher argued that Dr. Gabel's failure to disclose Dickenson as a former employee in his responses to interrogatories or during his deposition testimony placed her at a "tremendous disadvantage." She said she would be moving for sanctions:
First of all, it was not our obligation to go out and hunt her down. It was their obligation on at least two occasions in sworn testimony to tell us who she was.
. . .
And so the critical issue to us again is, we are in the middle of trial ... none of this is the plaintiff's fault. It is squarely on the shoes of the defense, and we are put at a tremendous disadvantage.
. . .
I think I need to have a break on Wednesday morning to have an opportunity to fully discuss this case with Ms. Dickenson.... I need to have several, frankly, several hours with her to show her the medical records and sit down with her. She lives 150-odd miles away. But I may need to recall Ms. Goble. I may also need to take telephone testimony from Dr. Miller. I have multiple things at this point. We are also going to be making a motion for sanctions.[[7]]
¶ 14 The court did not rule immediately on Deutscher's request for a break in the trial. Deutscher brought it up again the next day and reiterated that her need for extra time was due to Dr. Gabel's discovery violation:
We found out about her two days, two business days, before the trial started ... we asked for all relevant witnesses to be identified in June of 2004. She wasn't identified. We made requests for any employees of Dr. Gabel who had left his employ in the last two years .... she believes there are records missing, and she believes there have been deletions to the records. These are new facts to us.[[8]]
¶ 15 Fitzer objected to characterizing Dr. Gabel's conduct as a discovery violation, pointing out that Deutscher could have asked him during his deposition about the identity of the nurse whose handwriting was on the charts, but it "obviously was not on her list of what was important."[9] Deutscher responded that a note on Summer's chart stating "wants hyster scheduled" had always been at *359 the heart of the case and "it defies credibility that Mr. Fitzer did not ask who wrote that note." The court asked Deutscher, "Did you ask who wrote that note?"[10] Deutscher replied that she did not because Dr. Gabel had led her to believe there had been no changes in his nursing staff:
I did not ask who wrote that note. And again, this was done in 2004. But in essence, what they are doing is they knew who this nurse was. And if they didn't know, they should have known. I specifically asked if they had gotten rid of anybody, and when he said no, the only person who had left ... was Rachel Jaeger, that implied that his nurse hadn't left....
. . .
... I specifically asked: Who left your employ?
. . .
So in essence, what is being said here is they cannot disclose an absolutely critical witness that we had no way of suspecting even existed and we found by happenstance, total happenstance, we found this witness.
We would have gone through this whole trial and not known.[[11]]
The court granted Deutscher's request for several additional hours to talk with Dickenson the next day in preparation for Dickenson's trial testimony, which was set to begin at 1:30 p.m.
¶ 16 The next day was May 17. That morning, Deutscher filed a brief on the admissibility of Sandra Dickenson's testimony. A section of the brief argued that Dr. Gabel had committed sanctionable misconduct when he failed to identify Sandra Dickenson in response to plaintiff's discovery requests. Deutscher argued that sanctions were mandatory under CR 26(g) and Fisons, and that the appropriate sanction was to allow Dickenson to testify without permitting the defense to add an additional witness to rebut her testimony.
¶ 17 At 1:00 p.m., after Deutscher concluded her meeting with Dickenson, the parties appeared in court to discuss the parameters of Dickenson's testimony. Deutscher reported that Dickenson did indeed remember Summer as a patient in the office. She said Dickenson was also prepared to testify about a number of things relating to Dr. Gabel's practices with respect to charting, dictation, appointments, scheduling and record keeping. The court indicated that it was still inclined to let Dickenson testify, but suggested that limitations might need to be imposed to the extent Dickenson was now recalling things the defendants had not learned about in the previous deposition. Deutscher resisted this suggestion:
That's not our problem. Okay? If they had told us about her when they should have, we would have known when she worked there and we certainly would have found her and we would have investigated.
. . .
I would love to sit here and have a deposition that had been comprehensively taken. Why don't we have that? And that's why I go back to the sanctions issue. This is the most appropriate case in my 20 years of practice that I have ever seen to have a sanction awarded for this. I mean, if this isn't a discovery abuse, I don't know where there is one.[[12]]
¶ 18 The court ruled that Dickenson would be allowed to testify, but only after the defendants had the opportunity to depose her and make a record that would facilitate preliminary rulings. The court arranged for Dickenson's trial testimony to be delayed until the following morning and released the jury for the day. The court did not address Deutscher's motion for sanctions.
¶ 19 It was on the next morning, May 18, that Maria White's deposition came to the court's attention. Fitzer brought it into court and used it to show that Deutscher knew months earlier that Sandra Dickenson had temporarily worked as a nurse for Dr. Gabel in the summer of 2003, had then left *360 his employ, and was now thought to be working for a Dr. Case in Olympia. Fitzer apologized to the court "for not realizing that I knew about this name seven months ago. And I hope this puts to rest the idea that Ms. Deutscher didn't either."[13]
¶ 20 Upon disclosure of the fact that Deutscher had actually heard about Sandra Dickenson long before trial, Providence moved to exclude Dickenson. "She was certainly not a late-disclosed witness from the defense point of view .... there's no excuse for her appearing for the first time on plaintiff's witness list on the day of trial." The court denied the motion:
So given the fact that we are down this road this far, there has now been full discovery on this witness, there has been opportunity for the parties to investigate this witness, I did not know of this information from Mr. Fitzer until this morning, and all the parties are prepared to go forward with the examination of this witness, and certainly her testimony is probative, we will go forward with the testimony of the witness.[[14]]
¶ 21 Dickenson took the stand and testified that the office had scheduled Summer as a hysterectomy patient before she even came in for her first appointment with Dr. Gabel. Dickenson stated that several entries on Summer's medical chart  including the one indicating that the patient wanted a hysterectomy  had not been present when she first reviewed the chart, and must have been added after the fact. Dickenson remembered talking to Summer, and she said the new entries were not consistent with what she had been told by Summer. Her testimony contradicted Dr. Gabel's claim that it was Summer who insisted on going forward with a hysterectomy.
¶ 22 The trial ended with testimony from Dr. Gabel and another witness. On May 23, the court dealt with pending motions. One of these was Deutscher's motion to sanction Dr. Gabel for his nondisclosure of Sandra Dickenson. The court acknowledged that Dr. Gabel should have identified Dickenson when asked about his former employees. The court nevertheless denied the motion for sanctions because the plaintiffs had learned the same information from receptionist Maria White:
However, there's no prejudice to the plaintiff because in September 2005, it's now undisputed that a witness disclosed the name of Sandra Dickenson during a deposition, specifically, stating that she may have been the nurse during the time that Summer Ann Goble was, in fact, cared for by Dr. Gabel.
So the plaintiff knew that Ms. Dickenson or should have known she was a potential witness in the hospital  excuse me  in the doctor's office at the time of the treatment, and she knew that as early as September of 2005....
It's a matter of practice, there's simply no justification for filing a motion for sanctions in this case.[[15]]
Closing arguments took place on May 24. The jury returned its verdict for Summer on May 26.
¶ 23 On June 8, 2006, Dr. Gabel and Providence filed the motion for sanctions that gave rise to this appeal. They alleged that Deutscher made "false statements to the Court regarding the time and circumstances in which witness Sandra Dickenson was identified."[16] In a responding brief, Deutscher did not deny that she knew about Sandra Dickenson through Maria White's deposition. She said that when she presented Dickenson as a newly discovered witness, what she meant was that she did not previously know Dickenson had any relevance to the case. She continued to place all blame upon Dr. Gabel for the trial interruptions:
During an extended discussion on the record regarding the circumstances behind her late request to have Ms. Dickenson testify, Ms. Deutscher stated: "we knew about her about three days before this trial *361 started." It was not Ms. Dickenson's name that Ms. Deutscher learned about shortly before trial, but the fact that Ms. Dickenson was a person with relevant and material knowledge.
. . .
There was no statement by Ms. Deutscher that she had discovered Ms. Dickenson's name shortly before trial, and no mistaken belief on the part of the Court that Ms. Deutscher had not known Ms. Dickenson's name until shortly before trial.
...
... Dr. Gabel's false response during his deposition and his failure to identify Ms. Dickenson in response to Plaintiff's Interrogatory 14 or a supplement thereto were the reasons that Ms. Deutscher did not investigate Ms. Dickenson as a potential witness at an earlier date.[[17]]
¶ 24 The trial court granted the motion for sanctions, focusing on Deutscher's lack of candor about when she learned about Dickenson:
The Court awards terms (all attorneys fees and costs) against Ms. Deutscher only, and not Summer Ann Goble or Todd Elliot, limited to time and costs related to Ms. Deutscher's groundless request for discovery at trial on the subject of an allegedly recently discovered witness, Sandra Dickenson, and for her baseless request for sanctions against a defense lawyer. The Court took Ms. Deutscher seriously, added the witness, allowed the discovery and considered sanctions against defense counsel. Ms. Deutscher was not candid to the Court about when she learned about this witness. This lack of candor caused an immense amount of trial time to be expended on discovery mid-trial. Had the truth been known, a motion to exclude (which the defendants made, and which was denied) would have disposed of the matter in less than five minutes on the first day of trial. Once the truth was known, she did not deny that she had become aware of the witness much earlier.
. . .
... Ms. Deutscher represented to the Court numerous times that she was completely unaware of Ms. Dickenson and that she had learned of her only by accident through another person shortly before the trial began.
. . .
On the morning that Ms. Dickenson was to testify, Mr. Fitzer informed the Court (and the parties do not now dispute) that Ms. Deutscher learned of Ms. Dickenson as a potential witness no later than September 2005 in a deposition that Ms. Deutscher scheduled and took and in questions that she asked....
Ms. Deutscher never disclosed this fact to the Court. Once Mr. Fitzer disclosed this fact, Ms. Deutscher only stated that she was entitled to rely upon Dr. Gabel's deposition answer made in 2004, eight months before Ms. Dickenson's name was disclosed in the September 2005 deposition. She has never suggested, in Court or in later briefing, that she simply forgot.
In the context of a discovery motion to compel, Ms. Deutscher could have argued that Dr. Gabel's deposition answer was not accurate and that he should have disclosed Ms. Dickenson's name (she never filed such a motion). However, Ms. Deutscher could not rely upon Dr. Gabel's answer alone in affirmatively representing to the Court numerous times that she had never heard of the witness and in filing a Motion for Sanctions on that basis.[[18]]
¶ 25 The court rejected, as factually inaccurate, Deutscher's explanation that she was aware of Dickenson's name but not her relevance:
Ms. Deutscher now argues that she did inform the Court that she knew of Ms. Dickenson's name before trial, but informed the Court that she was unaware that she had relevant and material knowledge and that this is what she told the Court. This argument fails as it is factually inaccurate. During the trial, the Court was told explicitly and was given the impression *362 that the plaintiff had never heard of Ms. Dickenson at all. Moreover, this argument makes no sense because Ms. Deutscher first learned of Ms. Dickenson's name while learning that she may have worked for Dr. Gabel during the time her client was being treated. In other words, she learned of the name and the context for relevance simultaneously.
Ms. Deutscher's implicit and explicit representations in Court that she had never heard of Ms. Dickenson were not true. She was aware of the witness. When this matter was called to her attention in Court by Mr. Fitzer, she did not deny this. She should have fully disclosed to the Court all information she had about her knowledge of Ms. Dickenson, especially the September 2005 deposition that she took. See RPC 3.3(a). Without candor from counsel, this Court cannot, and in this case, was not able to make a fully informed and fair decision under the rules of civil procedure.
If the Court had been fully informed at the time, Ms. Dickenson would not have been allowed to testify. She was disclosed long before discovery cutoff. There was no attempt to add Ms. Dickenson by motion or provide a disclosure of her name. If Ms. Deutscher had disclosed the fact that Ms. Dickenson was known to her by September 2005, this matter could have been handled pretrial in a few minutes by motion.
These terms are reasonable and narrowly tailored for two reasons. First, the Court, when made aware of the fact that Ms. Dickinson was known in September 2005, considered but rejected the more severe remedy of exclusion of the witness. The Court took into consideration the fact that the parties had taken depositions of the witness. Exclusion at that point would have punished the plaintiff rather than the attorney.
Second, this remedy is narrowly tailored when considering other misconduct of counsel during the trial and for which she is not being sanctioned and for which terms are not being imposed.[[19]]
¶ 26 On appeal, Deutscher argues that she simply forgot that she heard about Dickenson during White's deposition. And she maintains that it was perfectly understandable that she would forget, because she was entitled to rely on Dr. Gabel's silence about Dickenson during discovery.
¶ 27 If the situation had been presented to the trial court as one of simply forgetting, this would be a different case. But the argument that Deutscher simply forgot about Dickenson is new on appeal. The trial court's order states: "She has never suggested, in Court or in later briefing, that she simply forgot."
¶ 28 "A trial court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law." Fisons, 122 Wash.2d at 339, 858 P.2d 1054. Deutscher dwells upon Dr. Gabel's failure to disclose Dickenson during discovery. Deutscher contends that the court's decision to sanction her was driven by the erroneous view that it was her responsibility, not Dr. Gabel's, to "ferret out" Dickenson.
¶ 29 It is true that Dr. Gabel is blameworthy for his failure to disclose Dickenson. The trial court expressly recognized that Dr. Gabel and his counsel were not justified in their failure to disclose.[20] Dr. Gabel was directly asked whether all of his employees during the past two years were still currently working for him. The inaccurate answer he gave to this question would have prevented the plaintiff from discovering a witness who had highly relevant testimony, if Dickenson had remained otherwise undisclosed. But Dickenson did not remain undisclosed. As the trial court concluded, Dr. Gabel's violation did not prejudice the plaintiff. Seven months before trial, Deutscher was provided with all of the information that made Sandra Dickenson worthy of investigation as a potentially critical witness  the fact that she had been formerly employed as the nurse in Dr. Gabel's small office at approximately the same time that Summer Goble was being treated there. No appeal has been taken from the trial court's decision not to sanction *363 Dr. Gabel. We decline Deutscher's invitation to make Dr. Gabel's misconduct the pivotal point of our analysis. The issue in this appeal is whether the court erred in sanctioning Deutscher.
¶ 30 Deutscher also argues that the court's decision to sanction her was based on the erroneous view that Dickenson could have been properly excluded as a witness if the trial court had known all the facts at the beginning of trial. The trial court commented that the last-minute request to list Dickenson as a witness would have been denied "in a few minutes" but for the erroneous assertion that she was newly discovered. Deutscher argues that excluding Dickenson would have been manifestly incorrect under Burnet v. Spokane Ambulance, 131 Wash.2d 484, 497-98, 933 P.2d 1036 (1997) (disallowing evidence and limiting discovery was too severe a sanction given the length of time to trial, the severity of the injury to plaintiff, and the absence of a finding that the plaintiff had willfully violated a court order). She contends the court's remark shows that the decision to sanction Deutscher was driven "by a misplaced notion about the importance, above all else, of compliance with case management deadlines."[21]
¶ 31 We disagree. The trial court did not make a decision to exclude Dickenson. The trial court made a decision to sanction Deutscher. The court's comment that it would have excluded Dickenson was not the driving force behind the sanctions decision. The driving force behind the decision was the court's appreciation of its obligation to insist upon candor from attorneys. Misleading the court is never justified. As stated in Fisons: "Misconduct, once tolerated, will breed more misconduct and those who might seek relief against abuse will instead resort to it in self-defense." Fisons, 122 Wash.2d at 355, 858 P.2d 1054 (citation omitted). Imposing sanctions upon an attorney is a "difficult and disagreeable task" for a trial judge, but if sanctions are warranted, it is a necessary task "if our system is to remain accessible and responsible." Fisons, 122 Wash.2d at 355, 858 P.2d 1054. Fisons states that "a spirit of cooperation and forthrightness during the discovery process is necessary for the proper functioning of modern trials." Fisons, 122 Wash.2d at 342, 858 P.2d 1054. The trial court properly applied Fisons when stating, "without candor from counsel, this court cannot, and in this case, was not able to make a fully informed and fair decision under the rules of civil procedure."[22]
¶ 32 The dissent contends that the sanctions order should be reversed because the particular sanction chosen  payment of the other side's attorney fees  was crafted on the erroneous belief that Dickenson could have been excluded as a witness if Deutscher had been truthful at the beginning of trial. But Deutscher's misrepresentation and lack of candor to the court deserved sanction regardless of what would have happened if she had told the truth. Below, Deutscher did not accept or acknowledge her lack of candor nor did she propose that a different type of sanction, such as a payment to a court fund, would be more appropriate. At this late date and on this record, we decline to second guess the trial court's discretion in deciding the type of sanction to impose.
¶ 33 We conclude that the trial court's decision to impose sanctions was squarely based on a correct understanding of the law set forth in Fisons. We cannot say the court abused its discretion by judging Deutscher's misrepresentation to be a sanctionable act and by choosing payment of attorney fees as a sanction.
¶ 34 Affirmed.
I CONCUR: SCHINDLER, C.J.
DWYER, A.C.J. (dissenting)
¶ 35 I do not share the majority's comfort in viewing attorney Anne Deutscher's lack of candor to the trial court in isolation from the nature of the sanction putatively imposed as a result. The majority concludes that the trial court properly sanctioned Deutscher for failing to properly disclose when she first learned that Sandra Dickenson might be the *364 nurse who treated Summer Goble, thus learning that Dickenson might be a key witness in Goble's medical malpractice lawsuit against Dr. Jeffrey Gabel. Even accepting this characterization of the trial court's rationale for sanctioning Deutscher, however, the record demonstrates that the actual sanction imposed was unrelated to Deutscher's putative wrongful conduct. Rather, the sanction expressly reflected the trial court's erroneous view that it could have properly excluded Dickenson's testimony based on Deutscher's late disclosure of Dickenson as a witness, and that Goble's motion for sanctions against Dr. Gabel's attorney was improper. The principles articulated in Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 858 P.2d 1054 (1993), show that this late disclosure was attributable to Dr. Gabel's discovery violations, not to Deutscher's failure to independently discern Dickenson's significance as a witness. Thus, the exclusion of Dickenson's testimony would have been an abuse of the trial court's discretion. Because, accordingly, the sanction imposed on Deutscher was also a clear abuse of the trial court's discretion, I dissent.
¶ 36 Dr. Gabel performed an unnecessary hysterectomy on 22-year-old Goble, permanently depriving her of the ability to bear children. When Goble sued, Dr. Gabel altered Goble's medical records to make them appear consistent with his story that she had sought to have a hysterectomy in spite of his cautions to the contrary. In fact, he had told her that she had no other options. During discovery, Dr. Gabel repeatedly (and wrongfully) failed to disclose that Dickenson had been the nurse that treated Goble  someone who could both testify that Dr. Gabel had altered Goble's medical records and that he had consistently lied about the events leading up to Goble's hysterectomy. Notwithstanding this, the majority concludes that the trial court properly sanctioned Goble's attorney, Deutscher, by awarding terms in favor of Goble's litigation adversaries.
¶ 37 The majority writes that "[t]he court's comment that it would have excluded Dickenson was not the driving force behind the sanctions decision. The driving force behind the decision was the court's appreciation of its obligation to insist upon candor from attorneys." Assuming  without accepting  the accuracy of this statement, the nature of the sanction still correlated directly and exactly with the trial court's erroneous belief that it would have been justified in excluding Dickenson's testimony had Deutscher been honest about when she learned of Dickenson's existence, and that Goble's motion seeking sanctions against Dr. Gabel for failing to disclose Dickenson as a possible witness was improper. The trial court made this unambiguously clear by forcing Deutscher to pay all of Providence's and Dr. Gabel's costs and attorney fees incurred as a result of interviewing Dickenson in preparation for her testimony:
The Court awards terms (all attorney fees against costs) against Ms. Deutscher ... limited to time and costs related to Ms. Deutscher's groundless request for discovery at trial on the subject of an allegedly recently discovered witness, Sandra Dickenson, and for her baseless request for sanctions against a defense lawyer. The Court took Ms. Deutscher seriously, added the witness, allowed the discovery and considered sanctions against defense counsel. Ms. Deutscher was not candid to the Court about when she learned about this witness. This lack of candor caused an immense amount of trial time to be expended on discovery mid-trial. Had the truth been known, a motion to exclude (which the defendants made, and which was denied) would have disposed of the matter in less than five minutes on the first day of trial.
¶ 38 Had the trial court ordered Deutscher to make a monetary payment to the court for failing to be candid about when she learned of Deutscher's identity, I would not hesitate to affirm it. See Fisons, 122 Wash.2d at 356, 858 P.2d 1054 ("we encourage trial courts to consider requiring that monetary sanctions awards be paid to a particular court fund or to court-related funds"). However, no such sanction was ordered. Instead, the trial court ordered Deutscher to pay Providence and Dr. Gabel all of their costs and fees associated with preparing for Dickenson's trial testimony. This sanction award was expressly premised on the notion that, had Deutscher been forthcoming about when she *365 first heard of Dickenson, the trial court could have properly excluded Dickenson's testimony and, hence, no preparation for that testimony on the part of Providence and Dr. Gabel would have been required. This is entirely incorrect.
¶ 39 I do not share the majority's serenity in believing that "[t]he trial court properly applied Fisons," thereby implying that the trial court could have justifiably excluded Dickenson's testimony had Deutscher been candid. Moreover, the majority's observation that "[t]he trial court did not make a decision" to actually exclude Dickenson's testimony, is misleading  the trial court explicitly crafted its sanction against Deutscher premised on the belief that it would have been justified in excluding Dickenson's testimony had Deutscher been candid about when she learned of Dickenson's existence. The sanction consisted of exactly the amount of money that Providence and Dr. Gabel would have saved if Dickenson had been excluded as a witness at the time she was disclosed by Deutscher. Under the majority's view, this sanction was consistent with the principles of Fisons because the exclusion of Dickenson's testimony would have been proper. I am convinced that this application of Fisons is exactly backwards, and that exclusion of Dickenson's testimony would have been improper under the principles of that and other cases.
¶ 40 The fundamental and overriding principle articulated in Fisons is that neither a party nor an attorney representing a party may fail to produce information responsive to properly crafted interrogatories or requests for production, and that submitting an affidavit certifying compliance with the discovery rules in the face of such failure makes sanctions against the violator mandatory. Fisons, 122 Wash.2d at 349-50, 355, 858 P.2d 1054. Here, on a minimum of three occasions, Dr. Gabel had a duty to disclose that Dickenson was the nurse who treated Goble: in response to Goble's original interrogatories, during his own deposition when directly asked who might have been Goble's treating nurse, and to supplement the deposition testimony of receptionist Maria White bringing Dickenson's existence to light. The trial court's refusal to sanction Dr. Gabel for these serious and obvious discovery violations was inexplicable and incorrect. Moreover, while this refusal is not the subject of this appeal, it is directly relevant to the propriety of the sanctions imposed against Deutscher.
¶ 41 This is so, most obviously, because those sanctions included all costs and fees incurred by Dr. Gabel and Providence in defending against Deutscher's supposedly "baseless request for sanctions against a defense lawyer." Thus, insofar as the majority "decline[s] Deutscher's invitation to make Dr. Gabel's misconduct the pivotal point" in its analysis, it ignores a significant portion of the monetary sanction imposed against Deutscher. It also skirts the necessity of addressing the absence of any basis whatsoever supporting the trial court's conclusion that Goble's motion was "baseless."
¶ 42 Less obviously, but just as importantly, the principles articulated in Fisons and the cases in accord with Fisons should lead the majority to conclude that exclusion of Dickenson's testimony would have been inappropriate as a sanction for Deutscher's misconduct. As a result of this, a monetary sanction premised solely on the trial court's incorrect conclusion that it could have properly excluded Dickenson's testimony  if only Deutscher had been more forthcoming  and crafted precisely to reflect that erroneous conclusion, is likewise inappropriate. "[T]he least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed." Fisons, 122 Wash.2d at 355-56, 858 P.2d 1054.
¶ 43 There was absolutely no basis for the trial court's apparent belief that the wholesale exclusion of a critical fact witness's testimony  a punishment directed at Goble  was the least severe sanction adequate to punish Deutscher for her apparent lack of candor. On the contrary, there is a wealth of cases holding precisely the opposite: "`it is an abuse of discretion to exclude testimony as a sanction [for noncompliance with a discovery order] absent any showing of intentional nondisclosure, willful violation of a court order, or other unconscionable conduct.'" Burnet v. Spokane Ambulance, 131 Wash.2d 484, 494, 933 P.2d 1036 (1997) (quoting Fred *366 Hutchinson Cancer Research Ctr. v. Holman, 107 Wash.2d 693, 706, 732 P.2d 974 (1987)) (alteration in original) (internal quotation marks omitted)[1] The majority's implicit endorsement of the opposite view ignores that "[o]ur overriding responsibility is to interpret the rules in a way that advances the underlying purpose of the rules, which is to reach a just determination in every action." Burnet, 131 Wash.2d at 498, 933 P.2d 1036 (citing CR 1).
¶ 44 Here, exclusion of Dickenson's testimony would not have been an appropriate sanction for Deutscher violating the trial court's witness disclosure schedule. A violation of a court order is willful only if it is done without reasonable excuse. Hyundai Motor Am. v. Magana, 141 Wash.App. 495, 511, 170 P.3d 1165 (2007). Deutscher had a more-than-adequate excuse for not believing that Dickenson was a witness with relevant testimony: Dr. Gabel's repeated (and untruthful) representations to that effect in his discovery responses. Since Fisons, discovery "responses must be consistent with the letter, spirit and purpose of the rules." Fisons, 122 Wash.2d at 344, 858 P.2d 1054. Litigants are entitled to rely on the completeness and accuracy of responses to discovery requests.
¶ 45 This notion, however, did not find its genesis in Fisons. Decades before that case, our Supreme Court made clear both that deceit during discovery is not to be rewarded and that a party's duty to exercise due diligence does not require the party to act with the presumption that the opposing party is a perjurer. In rejecting the assertion that a lawyer should always anticipate the opponent's deceit and independently investigate every fact, our Supreme Court observed:
Perhaps this is so, but the matter of diligence in investigating yielded to the categorical statements, made under oath, on a subject well within a party's knowledge which could, we think, forestall further investigation of the point involved.
Kurtz v. Fels, 63 Wash.2d 871, 874, 389 P.2d 659(1964).
¶ 46 Justice Hale, on behalf of the court, then unambiguously explained the lawyer's obligation:
We take the rule to be that, where a party to an action, in clear and unambiguous terms under oath, asserts the existence or nonexistence of a fact whereof such party has knowledge, or in the ordinary course of affairs would be expected to have knowledge, the adverse party may rely on such statements and, in the exercise of reasonable diligence, is not required to look behind the statements.
Kurtz, 63 Wash.2d at 875, 389 P.2d 659; accord Seals v. Seals, 22 Wash.App. 652, 656, 590 P.2d 1301 (1979) ("Where a party ... in clear and unambiguous terms ... asserts the nonexistence of a fact, of which that party has or should have knowledge, the requesting party may rely on such statements. The exercise of reasonable diligence does not require a party to look behind the answers.").
¶ 47 Accordingly, for over four decades, the standard to which the trial court and the majority hold Deutscher  that, as Goble's lawyer, she was required to assume that Dr. Gabel was being deceitful in his discovery responses and investigate the case in that light  has not been the law in Washington.
¶ 48 In fact, in order to exercise appropriate diligence, Deutscher was not required to discern that Dickenson was the nurse who had treated Goble  from an offhand remark in the deposition of a third-party witness  in the face of repeated assurances in Dr. Gabel's discovery responses that he had employed no nurses during the relevant period other than those he disclosed.
¶ 49 This being the case, the trial court's sanction, expressly formulated on its assumption that it would have had the discretion to properly exclude Dickenson's testimony based on Deutscher's supposed non-compliance *367 with the case scheduling order, would have been an abuse of discretion even if it had been made in response to Deutscher's violation of that order. This being so, it can hardly be said to be within trial court's discretion to impose the sanction it did here for something utterly unrelated to Dickenson's late disclosure by Deutscher: Deutscher's lack of candor about when she learned of Dickenson's existence.
¶ 50 "A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds. A trial court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law." Fisons, 122 Wash.2d at 339, 858 P.2d 1054 (internal footnotes omitted). The trial court's sanction of Deutscher was a clear abuse of discretion. From the majority's opinion holding to the contrary, I respectfully dissent.
NOTES
[1] Clerk's Papers at 1589 (Interrogatory 14).
[2] Clerk's Papers at 1605.
[3] Clerk's Papers at 1641-42.
[4] Exhibit 65 (Excerpt of Maria White's Deposition, Sept. 29, 2005).
[5] Report of Proceedings (May 4, 2006) at 5.
[6] Report of Proceedings (May 4, 2006) at 6-7.
[7] Report of Proceedings (May 15, 2006) at 10, 13, 14.
[8] Report of Proceedings (May 16, 2006) at 3-4.
[9] Report of Proceedings (May 16, 2006) at 18.
[10] Report of Proceedings (May 16, 2006) at 21.
[11] Report of Proceedings (May 16, 2006) at 21-22.
[12] Report of Proceedings (May 17, 2006) at 35, 47.
[13] Report of Proceedings (May 18, 2006, excerpt transcript) at 5.
[14] Report of Proceedings (May 18, 2006, excerpt transcript) at 7-8.
[15] Report of Proceedings (May 23, 2006) at 4.
[16] Clerk's Papers at 1072.
[17] Clerk's Papers at 1340-41, 1342, 1343 (emphasis in original).
[18] Clerk's Papers at 1448, 1449, 1450-51.
[19] Clerk's Papers at 1452.
[20] Clerk's Papers at 1450 n. 6.
[21] Appellant's Reply Br. at 19.
[22] Clerk's Papers at 1451.
[1] To the extent that opinions of this court prior to Burnet suggest that trial courts have unfettered discretion to exclude testimony for violations of scheduling orders, e.g., Dempere v. Nelson, 76 Wash.App. 403, 406, 886 P.2d 219 (1994), those cases were abrogated by Burnet. Moreover, those cases filed after Burnet, e.g., Lancaster v. Perry, 127 Wash.App. 826, 832, 113 P.3d 1 (2005), in which the party aggrieved by the dilatory discovery response was, itself, without culpability do not  for obvious reasons  control the disposition of this dispute.